## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| ALICIA SMITH, <br><br>          *Plaintiff*, <br><br>     v. <br><br> L'ORÉAL USA, INC., <br><br> L'ORÉAL USA PRODUCTS, INC., <br><br> SOFTSHEEN-CARSON INC., <br><br> STRENGTH OF NATURE, LLC, <br><br> GODREJ CONSUMER PRODUCTS LTD/ADR, <br><br> GODREJ SON HOLDINGS, INC. <br><br>     and <br><br> LUSTER, INC., <br><br>         *Defendants*. | |
| **Complaint with Jury Demand** | |

### NATURE OF ACTION

1.      This action arises out of Plaintiff Alicia Smith's diagnosis of endometrial cancer, which was directly and proximately caused by her regular and prolonged exposure to phthalates and other endocrine-disrupting chemicals in Defendants' hair relaxers.

2.      Plaintiff brings this action for claims arising as a direct and proximate result of the negligent, willful, and wrongful conduct of Defendants, their directors, agents, heirs, and assigns and/or their corporate predecessors' design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling,

and/or sale of the following products: Dark & Lovely, Motions, and Designer Touch, referred to collectively as "the Products."

## THE PARTIES

3. Plaintiff is a citizen and resident of Euclid, Ohio.

4. Defendant L'Oréal USA, Inc. is, and at all times relevant to this action was, incorporated in the State of Delaware with its principal place of business and headquarters located at 10 Hudson Yards, 347 10th Avenue, New York, New York 10001 and process may be served upon its registered agent, Corporation Service Company, 3366 Riverside Drive, Suite 103, Upper Arlington, Ohio 43221.

5. Defendant L'Oréal USA Products, Inc. is, and at all times relevant to this action was, incorporated in the State of Delaware with its principal place of business and headquarters located at 10 Hudson Yards, 347 10th Avenue, New York, New York 10001 and process may be served upon its registered agent, Corporation Service Company, 3366 Riverside Drive, Suite 103, Upper Arlington, Ohio 43221.

6. Defendant SoftSheen-Carson is, and at all times relevant to this action was, a limited liability company in the State of New York with its principal place of business and headquarters located at 10 Hudson Yards, 347 10th Avenue, New York, New York 10001 and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207. At all times relevant to this action, SoftSheen-Carson, LLC's sole members and interested parties are and were: L'Oréal S.A., which at all times relevant to this action was a corporation having its headquarters and principal place of business in France; and L'Oréal USA, Inc., incorporated in Delaware with its principal place of business and headquarters at 10

Hudson Yards, 347 10th Avenue, New York, New York 10001. This Court has jurisdiction over SoftSheen-Carson, LLC based on complete diversity of citizenship between Plaintiff and each member of SoftSheen-Carson, LLC and Defendants collectively.

7. Defendant Strength of Nature, LLC is, and at all times was relevant to this action was, a limited liability company organized in the State of Georgia, with its principal place of business and headquarters located at 64 Ross Road, Savannah, Georgia 31405, and process may be served upon its registered agent, Karan Sood, 64 Ross Road, Savannah, Georgia 31405. This Court has jurisdiction over Strength of Nature, LLC based on complete diversity of citizenship between Plaintiff and each member of Strength of Nature, LLC and Defendants collectively.

8. Defendant Godrej Consumer Products LTD/ADR is, and at all times relevant to this action, was incorporated in Mumbai, India, with its principal place of business and headquarters located at Godrej One, 4th Floor, Pirojshanagar, Eastern Express Highway, Vikhroli (East), Mumbai 400 079, India.

9. Defendant Godrej SON Holdings, Inc. is, and at all times relevant to this action was, incorporated in the State of Georgia, with its principal place of business and headquarters located at 64 Ross Road, Savannah, Georgia 31405, and process may be served upon its registered agent, Karan Sood, 64 Ross Road, Savannah, Georgia 31405.

10. Defendant Luster Products, Inc. is, and at all times relevant to this action was, incorporated in the State of Illinois, with its principal place of business and

headquarters located at 1104 West 43rd Street, Chicago, Illinois 60609, and process may be served upon its registered agent, Kimberly A. Palmisano, 3201 Old Glenview Road, Suite 325, Wilmette, Illinois 60091.

11. At all pertinent times, Defendants were engaged in the research, development, manufacture, design, testing, sale, and marketing of the Products, and introduced such products into interstate commerce with knowledge and intent that such products would be sold in the State of Ohio.

12. Plaintiff purchased Defendants' Products in the Northern District of Ohio, and the damages Plaintiff sustained occurred within the State of Ohio.

13. At all relevant times, Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Products, which were defective.

14. Defendants' defective hair products were placed into the stream of interstate commerce and used by Plaintiff until early 2020.

15. In December 2019, Plaintiff was diagnosed with endometrial cancer, a diagnosis caused by Plaintiff's exposure to chemicals in Defendants' Products.

## JURISDICTION AND VENUE

16. Jurisdiction is alleged under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and the parties are residents of different states.

17. On information and belief, at all relevant times, Defendants were present and transacted, solicited, and conducted business in this State through their employees, agents, and/or sales representatives, and derived substantial revenue from such business.

18.     At all relevant times, Defendants expected or should have suspected that their acts and omissions would have consequences within the United States and this State.

19.     This Court has personal jurisdiction over Defendants because they conduct business in this State, purposefully direct and/or directed their actions toward this State, consented to being sued in this State by registering an agent for service of process in this State, and/or consensually submitted to the jurisdiction of this State when obtaining a manufacturer or distributor license. Defendants have the requisite minimum contacts with this State for the Court to constitutionally exercise jurisdiction.

20.     Defendants' actions and/or inactions described in this Complaint were purposefully directed at and/or within this State, Plaintiff sustained damages within this State, and those damages were the result of Defendants' actions and/or inactions that were purposefully directed at or within this State.

21.     Venue is proper in this district under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district, Plaintiff resides here, and Defendants are subject to this Court's personal jurisdiction.

22.     Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact substantial business in this district.

## Factual Background

### A. Pervasive and systemic racial discrimination created the market for hair-relaxer products.

23.     Defendants sell hair relaxers against the backdrop of centuries of discrimination that has forced Black women to assimilate for social and economic survival in the United States.

24.     Bias against natural Black hair has its origins in enslavement and has been perpetuated for centuries through white supremacy and racism.

25.     By the early 1800s, enslaved Black women in the United States used butter knives to style their naturally curly hair to make it "more presentable" and less threatening to white people.[1]

26.     During the time when white people enslaved Black people in the United States, white "masters" or "overseers" commonly imposed a hierarchy upon enslaved people. Those who appeared more white—with lighter skin and straighter hair—were treated less harshly and received more favorable work assignments than those who appeared more African—with darker skin and more natural hair.[2]

---

[1] Kristen Collins Jackson, A History of Straightening Afro Textured Hair, www.bustle.com (Apr. 4, 2017) (available at https://www.bustle.com/articles/189044-a-brief-disturbing-history-of-all-the-times-society-straightened-afro-textured-hair) (last visited Dec. 22, 2022).

[2] Chanel Donaldson, *Hair Alteration Practices Amongst Black Women and the Assumption of Self-Hatred*, Applied Psychology Opus (available at https://wp.nyu.edu/steinhardt-appsych_opus/hair-alteration-practices-amongst-black-women-and-the-assumption-of-self-hatred/) (last visited Dec. 22, 2022) (citing A.S. Abdullah, *Mammy-ism: A Diagnosis of Psychological Misorientation for Women of African Descent*, J. of Black Psychology, 24(2), 196 – 210 (1998); I. Banks, *Hair Matters: Beauty, Power and Black Women's Consciousness*, New York University Press, 2000; T.O. Patton, *Hey Girl, Am I More Than My Hair? African American Women and Their Struggles with Beauty, Body Image, and Hair*, New York University Press (2010); C.L. Robinson, *Hair as Race: Why "Good Hair" May be Bad for Black Females*, Howard J. of Communications, 22(4), 358–76 (2011); C. Thompson, *Black Women, Beauty, and Hair as a Matter of Being*, Women's Studies, 38(8), 831–56 (2009)).

27.     These practices, beginning during the time of enslavement and continuing through the present day vis-à-vis white supremacy and systemic racism, have led many Black Americans to internalize white beauty standards.[3]

28.     By the 1840s, Black women were engaging in the dangerous practice of using hot combs to straighten their hair. Hot combs were metal combs that were heated by the flames of a stove and pulled through hair to straighten curls. Hot combs often caused accidental burns to the person's scalp and face.[4] Eventually, in the late 1960s, scientists would begin publishing studies linking the use of hot combs to scalp inflammation and scarring that caused hair loss called "hot comb alopecia." This type of hair loss is now known as central centrifugal cicatricial alopecia.[5]

29.     In the 1860s, even after enslaving Black people was no longer legal, the pressure for Black people to assimilate to white beauty standards was no less acute. Perhaps as a reaction to the dangerous hot combs, Black people often used a mixture of lye, potato, and egg to straighten their hair. These chemical relaxers, which relied on the same lye that many relaxers still use today, often caused severe scalp burns, just as hot combs did.[6]

30.     In 1902, Annie Malone began developing a recipe to straighten natural hair that was not lye-based like the other relaxers then available.[7]

---

[3] Donaldson (citing Banks, *Hair Matters* and N. Weathers, *Braided Sculptures and Smokin' Combs: African-American Women's Hair-Culture*, SAGE, 1991, at 58–61).

[4] Jackson, *A History of Straightening Afro Textured Hair.*

[5] *Id.*

[6] *Id.*

[7] *Id.*

31.    In 1913, the G.A. Morgan Hair Refining Company released its alkaline-chemical-based hair relaxer, which would popularize commercially available alkaline relaxing creams made specifically to straighten Black natural hair.[8] Black Americans were encouraged to "improve" their appearance by treating their hair with such products:



32.    In 1957, Johnson Products Company released its alkaline-based relaxer Ultra-Sheen, which it marketed as gentle.[9]

33.    Meanwhile, as television became popular during the 1960s, the white-dominated pop culture continued to present straight hair as a beauty ideal. Straight hair achieved massive popularity in movies and on TV.[10]

34.    Even children's toys ostensibly made for Black little girls embodied this white beauty ideal. When Mattel released its first Black doll for little girls in 1967, the doll

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

(named "Black Francie") wore her hair long and straight, just like Barbie.[11] Similarly, Barbie's first Black friend ("Christie") embodied the same Eurocentric beauty standards as white Barbie, including straight hair.[12]

35.     In the late 1970s, companies like Revlon began selling texturized hair relaxers, which partially relaxed natural hair and loosened the curls. These "perm" products allowed Black people to achieve the then-popular "Jheri Curl" hairstyle.[13]

36.     In the 1980s, Johnson Products released a relaxer that did not contain lye, which it marketed as "gentle" because it purportedly decreased the likelihood of scalp burns.[14]

37.     Even to the present day, Black women in the United States are under immense social pressure to conform to Eurocentric beauty ideals in a culture where white people often feel threatened by natural hair and Blackness generally. A dialogue between Chris Rock and Raven-Symoné in the 2009 documentary *Good Hair* illustrates how Black people sometimes feel the need put white people at ease by using relaxers:

| Raven-Symoné: | "I think you're trying to blend in. You're trying to make everybody comfortable, you know?" |
| Chris Rock: | "Relaxed." |
| Raven-Symoné: | "Relaxed. And not like, 'oh my God, what is that,' you know? That's what…" |
| Chris Rock: | "That's what the relaxer does." |

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

Raven-Symoné:    "That's what it does."

Chris Rock:    "It relaxes people."

38.    In addition to social pressures, modern Black women continue to relax their hair out of academic or economic necessity. The need to assimilate to succeed at school or in the workforce is demonstrated by the many instances in which Black children were disciplined or removed from school or in which Black women were fired for daring to wear their hair in the way it grows from their heads.[15]

39.    This discrimination is often perpetuated under the pretext of "dress codes."[16] To provide just a few examples:

    a.    In 1987, Cheryl Tatum was fired from her job as a Hyatt cashier because of her braided hairstyle, which her supervisor deemed both "extreme and unusual" and a violation of the dress code.[17]

    b.    In 2010, Chastity Jones was hired by Catastrophe Management Solutions, but with a caveat: cut her locs. When she refused, the company rescinded her job offer.[18]

    c.    In 2017, school administrators at Montverde Academy in Lake County, Florida demanded that a 16-year-old student change her natural hair because it was purportedly against the school's dress code.[19]

    d.    In 2018, a high-school wrestling referee in New Jersey insisted that a Black athlete's hair violated the rules of competition and gave him an

---

[15] Donaldson, *A History of Straightening Afro Textured Hair* (citing A.D. Byrd and L.L. Tharps, *Hair Story: Untangling the Roots of Black Hair in American*, 2001 and E.R. Shipp., *Braided Hair Style at Issue in Protests Over Dress Codes*, THE NEW YORK TIMES, Sep. 23, 1987).

[16] *Id.*

[17] *Id.*

[18] Chanté Griffin, *How Natural Black Hair at Work Became a Civil Rights Issue*, JSTOR DAILY (July 3, 2019) (available at https://daily.jstor.org/how-natural-black-hair-at-work-became-a-civil-rights-issue/) (last accessed Jan. 2, 2023).

[19] *School Asks Teen to Change her Natural Hair Style*, FOX 35 ORLANDO, https://www.fox35orlando.com/news/school-asks-teen-to-change-her-natural-hair-style (last accessed Dec. 22, 2022).

ultimatum: cut his hair or forfeit his match. The wrestler opted to compete, and his locs were shorn by the team trainer as his teammates, opponents, and a gym full of spectators looked on.[20]

e.   In 2018, school administrators at Christ the King Elementary School in Terrytown, Louisiana sent a Black elementary-school student home because she came to school in box braids.[21]

f.   In 2021, a five-year-old child was admonished for wearing braids to school, with an administrator advising that school policy banned braids, locs, and twists.[22]

40.   Indeed, Black women must often alter their natural hair to ensure economic security amidst pervasive racism: "As an extension of the assimilation concept, hair alteration can also represent a woman's attempt to remain attractive in the job market. In the professional world, a Black woman with natural hair is often deemed unkempt and unemployable."[23]

41.   Black women regularly face workplace discrimination for their hair because federal anti-discrimination law and most states' laws define "race" in a narrow manner that excludes hair as a racial characteristic.

---

[20] Michael Gold and Jeffrey C. Mays, *Civil Rights Investigation Opened After Black Wrestler Had to Cut His Dreadlocks*, THE NEW YORK TIMES (Dec. 21, 2018) (available at https://www.nytimes.com/2018/12/21/nyregion/andrew-johnson-wrestler-dreadlocks.html) (last accessed Dec. 22, 2022).

[21] Amira Rasool, *A Black Student was Reportedly Sent Home from Christ the King Elementary School for Wearing Box Braids*, TEEN VOGUE (available at https://www.teenvogue.com/story/black-student-box-braids-sent-home-christ-the-king-elementary-school) (last accessed Dec. 22, 2022).

[22] Charley Locke, *6 Kids Speak Out Against Hair Discrimination*, NEW YORK TIMES MAGAZINE (Apr. 22, 2022) (available at https://nytimes.com/2022/04/22/magazine/kids-hair-discrimination.html) (last accessed Jan. 2, 2023).

[23] Donaldson, *A History of Straightening Afro Textured Hair* (citing Abdullah, *Mammy-ism*; Thompson, *Black Women, Beauty, and Hair as a Matter of Being*; and C. Badillo, *Only My Hairdresser Knows for Sure: Stories of Race, Hair, and Gender*, NACLA REPORT ON THE AMERICAS, 34(6), 35–37 (2001).

42.   In recognition of Black women's reality, the United States House of Representatives passed the Creating a Respectful and Open World for Natural Hair Act ("the CROWN Act") in 2022, which would prohibit racial discrimination on the basis of a person's hair. On December 14, 2022, Senate Republicans blocked passage of the CROWN Act, allowing this type of racial discrimination to proceed unchecked by federal law.

43.   To date, only 19 states have passed their own versions of the CROWN Act to protect Black women and children from hair-based racial discrimination under state law.

44.   The resistance of the Senate and 31 states to prohibiting hair-based racial discrimination—a proposition that should be uncontroversial—demonstrates that white people remain biased against natural Black hair. Black women and girls are thus incentivized to continue using chemical hair relaxers, like Defendants' Products.

### B.   The modern hair-relaxer industry's marketing efforts have capitalized on systemic racism to peddle products that perpetuate Eurocentric ideals of "beauty."

45.   Hair-relaxer manufacturers have capitalized on the racial discrimination Black Americans—and Black women in particular—continue to endure.

46.   In 1971, Dark & Lovely manufactured the first modern commercial lye-based hair relaxer. The formula consisted of sodium hydroxide, water, petroleum jelly, mineral oils, and emulsifiers.[24] Like the more crude relaxers previously available,

---

[24] Cicely A. Richard, *The History of Hair Relaxers*, Sept. 29, 2017 (available at https://classroom.synonym.com/the-history-of-hair-relaxers-12078983.html) (last accessed Dec. 22, 2022).

Dark & Lovely worked because the lye weakened the internal protein structures of the hair, loosening the natural curls.[25]

47.     By the late 1970s, the damaging effects of lye-based hair relaxers—including breakage and thinning of the hair—caused no-lye relaxers to become more popular.[26] In 1981, Johnson Products company introduced "Gentle Treatment," the first no-lye relaxer, which used milder chemicals such as potassium hydroxide and lithium hydroxide.[27]

48.     In the 1990s, the first relaxer product for children—Just for Me—was introduced claiming to be "worry free" and "created in part by mothers especially for their daughters."[28] It soon became one of the most popular straightening treatments, touting a no-lye formula designed to be gentler for use on children.

49.     Today, Defendants market their relaxer products to Black customers across the nation and throughout the world, reinforcing the same Eurocentric standards of beauty. Defendants' marketing schemes rely heavily on branding and slogans that reinforce straight hair as the ultimate beauty standard. For example:

50.     Dark & Lovely's packaging features images of Black women with straight hair:

---

[25] *Id.* at 4.

[26] *Id.* at 5.

[27] *Id.*

[28] Dana Oliver, *The '90s Just For Me Hair Relaxer Commercial Song Is Stuck In Our Heads*, HUFFPOST, Feb., 1, 2014 (available at https://www.huffpost.com/entry/just-for-me-hair-relaxer-commercial-song_n_4689981) (last accessed Dec. 22, 2022). Commercial available at https://www.youtube.com/watch?v=2A4dY4znFsg (last accessed Dec. 22, 2022).



And Dark & Lovely's marketing makes a variety of claims about its natural ingredients and moisturizing benefits,[29] claiming it "Straightens better. Gentler than ever"[30] and that "It brings out the best in me."[31]

51. The marketing for Motions encourages Black women to "get pretty with shiny, make-them-stare hair."[32] Other ads claim that Motions "conditions hair at every step" with "less breakage" and "more shine" for "magic on your hair."[33]

52. Designer Touch's packaging proclaims its "multi-conditioning formula" that "gently relaxes without irritation." It specifically claims to be gentler than other relaxers, claiming it "relaxes without the irritation that sometimes occurs with other relaxer products."[34]

---

[29] Dark & Lovely on Amazon touting inclusion of "shea butter"—taking advantage of the Black community's familiarity with this popular skincare ingredient—and highlighting that the product "infuses and seals moisturization into each and every hair strand providing a soft and full finish" (available at https://www.amazon.com/Dark-Lovely-Conditioning-Relaxer-Regular/dp/B000KOM6HG) (last accessed Dec. 29, 2022).

[30] Dark & Lovely ad (available at https://www.youtube.com/watch?v=NlhtjmwZioc) (last accessed Dec. 29, 2022).

[31] Dark & Lovely ad (available at https://www.youtube.com/watch?v=Py5BjUNgzyM) (last accessed Dec. 29, 2022).

[32] Motion ad (available at https://www.youtube.com/watch?v=FMXgT1w1KL0) (last accessed Dec. 29, 2022).

[33] Motions ad (available at https://youtu.be/arTW9NLA-_o) (last accessed Dec. 29, 2022).

[34] Designer Touch on Texture Beauty Essentials (https://texturebe.com/designer-touch-sensitive-scalp-formula-no-lye-relaxer/) (last accessed Dec. 29, 2022).

### C.    Hair-relaxer application

53.    Hair relaxers are classified as creams or lotions that are specifically marketed to women of color to "tame" their hair by making it smoother, straighter, and easier to manage on a daily basis.

54.    Hair relaxing can be performed by a professional cosmetologist in a salon or barbershop or with at-home relaxer kits. Such kits are sold in grocery, drug, and beauty-supply stores throughout the country.

55.    Relaxers are applied to the base of the hair shaft and left in place for a "cooking" interval, during which the relaxer alters the hair's texture by purposefully damaging its natural protein structure. The effect of this protein damage straightens and smooths the hair. The treated portion of the hair grows away from the scalp as new growth sprouts from the roots, requiring additional relaxer treatment to smooth the roots. These additional treatments are colloquially referred to in the community as "retouches" or "touch-ups," resulting in women relaxing their new growth every four-to-eight weeks on average, often for decades.

56.    Hair relaxers can, and often do, cause burns and lesions in the scalp, causing hair relaxers' dangerous chemicals to enter users' bodies.

57.    The main ingredient of "lye" relaxers is sodium hydroxide; no-lye relaxers contain calcium hydroxide and guanidine carbonate, and "thio" relaxers contain thioglycolic acid salts. No-lye relaxers are advertised to cause fewer scalp lesions and burns than lye relaxers, but there is little evidence to support this claim.

58.    In some studies, up to 90% of Black and Brown women have used hair relaxers and straighteners, which is more commonplace for these women than for any other

race. Hair products such as relaxers contain hormonally active and carcinogenic compounds, such as phthalates. Phthalates are known to cause endocrine disruption but are not required to be listed separately as ingredients and are often broadly lumped into the "fragrance" or "perfume/parfum" categories.

59.     Most people who use hair relaxers begin use in formative childhood years. This is medically significant because adolescence is likely a period of enhanced susceptibility to debilitating conditions resulting from exposure to these chemicals.

60.     Once use of hair relaxers begins in childhood or adolescence, most people form a lifetime habit—especially because it is difficult to transition from relaxed to natural hair. The point at which the natural grow-out at the roots meets the relaxed portion of the hair shaft is prone to breakage, forcing many women to require extremely short haircuts to make the transition from relaxed hair to a natural style. The frequent scalp burns that accompany long-term relaxer use can increase the risk of permanent and debilitating diseases associated with long-term exposure to endocrine-disrupting chemicals.

### D.     Through the customary application and retouching process, hair relaxers wreak havoc on the endocrine system.

#### a.     The endocrine system

61.     The endocrine system regulates all biological processes in the body from conception through adulthood, including the development of the brain and nervous

system, the growth and function of the reproductive system, as well as the metabolism and blood-sugar levels.[35]

62.     The endocrine system is a tightly regulated system made up of glands that produce and release precise amounts of hormones that bind to receptors located on specific target cells throughout the body.[36]

63.     Hormones, such as estrogen, progesterone, and testosterone, are chemical signals that control or regulate critical biological processes.[37]

64.     When a hormone binds to a target cell's receptor, the receptor carries out the hormone's instructions (known as the stimulus)and either switches on or switches off specific biological processes in cells, tissues, and organs.[38]

65.     The precise functioning of the endocrine system is vital to maintain hormonal homeostasis, the body's natural hormonal production and degradation. A slight variation in hormone levels can lead to significant adverse-health effects, including reproductive impairment and infertility, cancer, cognitive deficits, immune disorders, and metabolic syndrome.[39]

---

[35] *Endocrine Disruption*, U.S. Environmental Protection Agency (Mar. 7, 2022) (available at https://www.epa.gov/endocrine-disruption/what-endocrine-system) (last accessed Dec. 23, 2022).

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] M.A. La Merrill et al., *Consensus on the Key Characteristics of Endocrine-Disrupting Chemicals as a Basis for Hazard Identification*, Nature Reviews Endocrinol (Nov. 12, 2019) (available at https://www.nature.com/articles/s41574-019-0273-8) (last accessed Dec. 23, 2022).

### b.      The dangers of endocrine-disrupting chemicals

66.     Endocrine-disrupting chemicals (EDCs) are chemicals, or chemical mixtures, that interfere with the endocrine system's normal activity.

67.     EDCs can act directly on hormone receptors as mimics or antagonists, or on proteins that control hormone delivery.[40]

68.     EDCs disrupt the endocrine system and interfere with the body's hormonal homeostasis in various ways.

69.     By mimicking a natural hormone, EDCs can cause the body to operate as if there were a proliferation of a hormone and thus over-respond to the stimulus or respond when it was not supposed to do so.

70.     EDCs can increase or decrease the levels of the body's hormones by affecting the production, degradation, and storage of hormones.

71.     EDCs can block the hormone's stimulus through inducing epigenetic changes, modifications to DNA that regulate whether genes are turned on or off or altering the structure of target cells' receptors.[41]

72.     EDCs are known to cause to numerous adverse health outcomes in humans including endometriosis, impaired sperm quality, abnormalities in reproductive organs, various cancers, altered nervous-system and immune function, respiratory

---

[40] E. Diamanti-Kandarakis et al., *Endocrine-Disrupting Chemicals: An Endocrine Society Scientific Statement*, Endocrine Reviews (June 30, 2009) (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726844/) (last accessed Dec. 23, 2022).

[41] L.D. Martínez-Razo et al., *The impact of Di-(2-ethylhexyl) Phthalate and Mono(2-ethylhexyl) Phthalate in placental development, function, and pathophysiology*, Environment International (January 2021) (available at https://www.sciencedirect.com/science/article/pii/S0160412020321838?via%3Dihub) (last accessed Dec. 23, 2022).

problems, metabolic issues, diabetes, obesity, cardiovascular problems, and neurological and learning disabilities.[42]

73.     EDCs that mimic the effects of estrogen in the body may contribute to disease risk because exposure to estrogen, either endogenously and exogenously, is associated with cancer. A woman's lifetime risk of developing certain cancers increases with greater duration and cumulative exposure to estrogen or estrogen-mimicking EDCs.

74.     Natural and synthetic EDCs are present in hair relaxers under the guise of "fragrance" and "perfumes/parfums," and thus enter the body when these products are exogenously applied to the hair and scalp.

75.     Indeed, numerous studies spanning more than two decades have demonstrated the adverse effects EDCs, including Di-2-ethylhexylphthalate, have on the male and female reproductive systems such as causing endometriosis, abnormal reproductive tract formation, decreased sperm counts and viability, pregnancy loss, and abnormal puberty onset.[43]

### i.     Phthalates generally

76.     Phthalates are known EDCs that interfere with natural hormone production and degradation and are detrimental to human health.[44]

---

[42] *Endocrine-Disrupting Chemicals (EDCs)*, Endocrine Society (Jan. 24, 2022) (available at https://www.endocrine.org/patient-engagement/endocrine-library/edcs#:~:text=EDCs%20can%20disrupt%20many%20different,%2C%20certain%20cancers%2C%20respiratory%20problems%2C) (last accessed Dec. 23, 2022).

[43] H. Kim et al., *Hershberger Assays for Di-2-ethylhexyl Phthalate and Its Substitute Candidates*, Dev Reproduction (Mar. 22, 2018) (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5915764/) (last accessed Dec. 23, 2022).

[44] Y. Wang et al., *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 2021 May; 9(5): 603 (available at  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/) (last accessed Dec. 23, 2022).

77.     Phthalates are chemical compounds developed in the last century that are used to make plastics more durable and flexible. These colorless, odorless, oily liquids are sometimes referred to as "plasticizers" based on their most common uses. Phthalates are also used as solvents and stabilizers in perfumes and other fragrance preparations, to improve the retention of fragrances, and to help topical products stick to and penetrate skin and hair.[45]

78.     Despite phthalates' short half-lives in human tissues, chronic exposure to phthalates will adversely influence the endocrine system and the functioning of multiple organs. Repeated exposure to phthalates has negative long-term impacts on the ability to get pregnant and carry a pregnancy to term, children's growth and development, and the health of children's and adolescents' reproductive systems. Several countries have established restrictions and regulations on some types of phthalates.[46]

79.     For decades, the Centers for Disease Control ("CDC") has found phthalates in individuals studied for chemical exposure.[47]

80.     At all relevant times, phthalates were used in the Products.

---

[45] Olivia Koski & Sheila Hu, *Fighting Phthalates*, National Resources Defense Council (Apr. 20, 2022) (available at https://www.nrdc.org/stories/fighting-phthalates) (last accessed Dec. 23, 2022).

[46] *Id*.

[47] *Biomarker Groups*, National Report on Human Exposure to Environmental Chemicals, Center for Disease Control (updated as of Sept. 1, 2022) (available at https://www.cdc.gov/exposurereport/pdf/Biomarker_Groups_Infographic-508.pdf) (last accessed Dec. 23, 2022).

81.     The FPLA requires an ingredient declaration on cosmetic products sold at the retail level to consumers. But FDA regulations do not require a listing of the fragrance components, which allows manufacturers to avoid disclosing the presence of phthalates by including them in the "fragrance" or "perfume/parfum" components of hair-relaxer products.

82.     Consumers, including Plaintiff, are thus unable to determine from the package label if phthalates are present in a hair-relaxer product, including the Products that harmed Plaintiff.

### ii.     Phthalate DEHP

83.     Di-2-ethylhexylphthalate (DEHP) is a phthalate.[48] It is a highly toxic manufactured chemical[49] that is not found naturally in the environment.[50] It is also known as Bis(2-ethylhexyl) phthalate.

84.     DEHP was first used in 1949 in United States and was the most abundantly used phthalate derivative in the twentieth century.[51]

---

[48]   *Di(2-ethylhexyl) phthalate (DEHP)*, Proposition 65, CA.gov, (available at https://www.p65warnings.ca.gov/fact-sheets/di2-ethylhexylphthalate-dehp) (last accessed Dec. 23, 2022).

[49]   S. Rowdhwal at al., *Toxic Effects of Di-2-ethylhexyl Phthalate: An Overview*, Biomed Research International (Feb., 22, 2018) (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5842715/#:~:text=DEHP%20is%20noncovalently%20bound%20to,and%20plastic%20waste%20disposal%20sites) (last accessed Dec. 23, 2022).

[50]   *Toxicological Profile for Di(2-Ethylhexyl) Phthalate (DEHP)*, U.S. Dept of Health and Human Services (Jan. 2022) (available at https://www.atsdr.cdc.gov/ToxProfiles/tp9.pdf) (last accessed Dec. 23, 2022).

[51]   P. Erkekoglu et al, *Environmental Effects of Endocrine-Disrupting Chemicals: A Special Focus on Phthalates and Bisphenol A*, Environmental Health Risk (June 16, 2016) (available at https://www.intechopen.com/chapters/50234) (last accessed Dec. 23, 2022).

85. DEHP does not covalently bind to its parent material. Non-covalent bonds are weak and, as a result, DEHP readily leaches into the environment increasing human exposure.[52]

86. Humans are exposed to DEHP through ingestion, inhalation, and dermal exposure for their lifetimes, including intrauterine life.[53]

87. The Agency for Toxic Substances and Disease Registry (ATSDR) estimates that the range of daily human exposure to DEHP is 3–30 µg/kg/day.[54]

88. The no-observed-adverse-effect level for DEHP to humans is 4.8 mg/kg bodyweight/day and the tolerate daily intake (TDI) is 48 µg/kg bodyweight.[55]

| Endpoint | Cancer (NSRL) | | Developmental and Reproductive Toxicity (MADL) | |
|----------|---------------|---|-----------------------------------------------|---|
| Route of Exposure | Oral | Inhalation | Oral | Inhalation |
| DEHP | 310 µg/day | N.C. | 410 µg/day | N.C. |

[52] K.H. Wong et al., *Exposures to Endocrine Disrupting Chemicals in Consumer Products – A Guide for Pediatricians*, Current Problems in Pediatric and Adolescent Health Care, Science Direct, Vol 47;5: 107–118 (May 2017) (available at https://www.sciencedirect.com/science/article/pii/S1538544217300822?via%3Dihub) (last accessed Dec. 23, 2022).

[53] J. Schmidt et al., *Effects of Di(2-ethylhexyl) Phthalate (DEHP) on Female Fertility and Adipogenesis in C3H/N Mice*, Environ Health Perspect, 2012 Aug; 120(8): 1123–1129. (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3440070/) (last accessed Dec. 23, 2022).

[54] P. Hannon et al., *Daily Exposure to Di(2-ethylhexyl) Phthalate Alters Estous Cyclicity and Accelerates Primordial Follicle Recruitment Potentially Via Dysregulation of the Phosphatidylinositol 3-Kinase Signaling Pathway in Adult Mice*, Biology of Reproduction Vol. 90(6) June 2014, 136, 1–11 (available at https://academic.oup.com/biolreprod/article/90/6/136,%201-11/2514356) (last accessed Dec. 23, 2022).

[55] Y. Wang et al., *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9(5):603, May 18, 2021 (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/) (last accessed Dec. 23, 2022).

Source: OEHHA's safe harbor levels for TDCIPP, DBP, DEHP, benzene, and formaldehyde. N.C. = not calculated by OEHHA as of August 2020.[56]

89. When DEHP enters in the human body, it breaks down into specific metabolites. The toxicity of DEHP is mainly attributed to its unique metabolites which include the primary metabolite, mono-(2-ethylhexyl)phthalate (MEHP), and secondary metabolites, mono-(2-ethyl-5-hydroxyhexyl)phthalate (MEHHP), and mono-(2-ethyl-5-oxohexyl)phthalate (MEOHP).[57]

90. DEHP and its metabolites are known to cause significant adverse health effects including, e.g., endometriosis, developmental abnormalities, reproductive dysfunction and infertility,[58] various cancers, and metabolic syndrome within the exposed individuals *and their future children.*[59]

---

[56] A. Reddam et al., *Inhalation of two Prop 65-listed Chemicals Within Vehicles May Be Associated with Increased Cancer Risk*, Environment International, Vol. 149, Apr. 2021, (available at https://www.sciencedirect.com/science/article/pii/S016041202100026X) (last accessed Dec. 23, 2022).

[57] Y. Saab et. al., *Risk Assessment of Phthalates and Their Metabolites in Hospitalized Patients: A Focus on Di- and Mono-(2-ethylhexyl) Phthalates Exposure from Intravenous Plastic Bags*. Toxics, 10(7), 357 (available at https://pubmed.ncbi.nlm.nih.gov/35878262/) (last accessed Dec. 23, 2022); I. Sheikh, et. at., *Endocrine disruption: In silico perspectives of interactions of di-(2-ethylhexyl)phthalate and its five major metabolites with progesterone receptor*, BMC Structural Biology Vol. 16, Suppl. 1, 16, Sept. 30, 2016 (available at https://bmcstructbiol.biomedcentral.com/articles/10.1186/s12900-016-0066-4) (last accessed Dec. 23, 2022). Other secondary metabolites include mono(2-ethyl-5-carboxypentyl)phthalate (5-cx-MEPP) and mono[2-(carboxymethyl)hexyl]phthalate (2-cx-MMHP).

[58] K Richardson et al., *Di(2-ethylhexyl) Phthalate (DEHP) Alters Proliferation and Uterine Gland Numbers in the Uterine of Adult Exposed Mice,* Reprod Toxicol*,* 2018 Apr; 77:70–79 (available at https://pubmed.ncbi.nlm.nih.gov/29458081/) (last accessed Dec. 23, 2022).

[59] Y. Wang et al., *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 2021 May; 9(5): 603 (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/) (last accessed Dec. 23, 2022).

91.    The results of studies on laboratory animals and human epidemiological data suggest associations between DEHP exposure and negative effects on exposed individuals' growth, development, and reproductive functioning.[60]

92.    Human epidemiological studies have shown a significant association between phthalate exposure and adverse reproductive outcomes in both women and men.[61]

93.    DEHP is significantly related to insulin resistance and higher systolic blood pressure and reproductive-system problems, including earlier menopause, low birth weight, pregnancy loss, and preterm birth.[62]

94.    Since the turn of the century, restrictions on phthalates have been proposed in many countries. In 2008, the U.S. Congress announced the Consumer Protection Safety Act (CPSA) that permanently banned certain products—children's toys and childcare articles—containing DEHP, DBP, and BBP at levels >0.1% by weight.[63] DEHP is listed as a hazardous pollutant in the Clean Air Act.

---

[60] *Chapter 2: Health Effects*, Toxicological profile for Di(2-ethylhexyl) phthalate (DEHP) (2001) (available at https://www.atsdr.cdc.gov/ToxProfiles/tp9-c2.pdf) (last accessed Dec. 28, 2022).

[61] *Id.*

[62] N.M. Grindler et al., *Exposure to Phthalate, an Endocrine Disrupting Chemical, Alters the First Trimester Placental Methylome and Transcriptome in Women*, Scientific Reports Vol. 8, (April 17, 2018) (available at https://doi.org/10.1038/s41598-018-24505-w) (last accessed Dec. 28, 2022).

[63] Consumer Product Safety Improvement Act of 2008, 122 Stat. 3016, Public Law 110–314 110th Cong. (Aug. 14, 2008) (available at https://www.congress.gov/110/plaws/publ314/PLAW-110publ314.pdf) (last accessed Dec. 28, 2022).

### c.  Uterine or endometrial cancer is associated with exposure to EDCs in the Products.

95.　Every year around 65,000 women develop uterine or endometrial cancer in the United States. It is commonly diagnosed in the seventh decade of life, with the mean age being 61 years.[64]

96.　The incidence of uterine or endometrial cancer in Black women is twice that of white women.[65] In addition, Black women with uterine or endometrial cancer have a poorer prognosis than white women.[66]

97.　Though death rates from other cancers in women have declined in recent years, death rates for uterine or endometrial cancer have increased by more than 100% in the last 20 years.[67]

98.　New cases of uterine or endometrial cancer have increased by 0.6% annually from 2010 to 2019, and death rates have risen an average of 1.7% annually during the same time frame.[68]

---

[64] *Cancer Stat Facts: Uterine Cancer*, National Cancer Institute, (available at https://seer.cancer.gov/statfacts/html/corp.html) (last accessed Dec. 28, 2022).

[65] *Id.*

[66] J Sorosky, *Endometrial Cancer*, Obstet Gynecol, 2012 Aug;120(2 Pt 1):383–97 (available at https://pubmed.ncbi.nlm.nih.gov/22825101/) (last accessed Dec. 28, 2022).

[67] L Duska et al., *Treatment of Older Women with Endometrial Cancer: Improving Outcomes With Personalized Care*, Am Soc Clin Oncol Educ Book 2016;35:164–74 (available at https://pubmed.ncbi.nlm.nih.gov/27249697/) (last accessed Dec. 28, 2022).

[68] J Lee, *Rising Endometrial Cancer Rate Spur New Approaches to Prevention*, National Cancer Institute: Division of Cancer Prevention (June 28, 2022) (available at https://prevention.cancer.gov/news-and-events/blog/rising-endometrial-cancer) (last accessed Dec. 28, 2022).

99.    A groundbreaking study recently found that women who use chemical hair relaxers have a higher risk of contracting uterine or endometrial cancer.[69]

100.    The study found that an estimated 1.64% of women who never used chemical hair relaxers would go on to develop uterine cancer by the age of 70; but for frequent users of such products, that risk more than doubles, increasing to 4.05%.[70]

101.    These risks disproportionately affect Black women, who make up the overwhelming majority of consumers of hair relaxers, including Defendants' Products.

### E.    The existing regulatory framework for cosmetics does not protect hair-relaxer users like Plaintiff.

102.    The law does not require cosmetic products and ingredients, other than color additives, to have FDA approval before they go to market. But there are laws and regulations that apply to cosmetics placed into the market. The two most important laws pertaining to cosmetics marketed in the United States is the Food Drug and Cosmetic Act ("FDCA") and the Fair Packaging and Labeling Act ("FPLA").

103.    The FDCA expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.

104.    Under the FDCA, adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging shipping or handling. A cosmetic is adulterated if (1) it bears or contains

---

[69] C Chang, et al., *Use of Straighteners and Other Hair Products and Incident Uterine Cancer*, J Natl Cancer Inst. 2022 Dec 8;114(12):1636–1645 (available at https://pubmed.ncbi.nlm.nih.gov/36245087/) (last accessed Dec. 28, 2022).
[70] *Id.*

any poisonous or deleterious substance causing injury to the product user or (2) its container is composed, in whole or in part, of any poisonous or deleterious substance that may render the contents injurious to health.[71]

105.    Under the FDCA, misbranding refers to violations involving improperly labeled or deceptively packaged products. A cosmetic is misbranded if (1) the label is false or misleading, (2) the label does not include all required information, (3) required information is not prominent and conspicuous, or (4) the packaging and labeling is in violation of an applicable regulation issued per section 3 and 4 of the Poison Prevention Packaging Act of 1970.[72]

106.    Under federal law, cosmetic manufacturers are not required to submit their safety data to the FDA. But it is unlawful to put an ingredient in a cosmetic that makes the cosmetic harmful when used as intended.[73]

107.    On May 20, 2022, the FDA published a rule to amend its food-additive regulations to revoke authorization for 25 plasticizers (including 23 phthalates) in various food-contact applications.[74]

108.    Companies that manufacture and market cosmetics have a legal duty to ensure the safety of their products. Neither the law nor FDA regulations require specific

---

[71] FDCA, 21 U.S.C. § 361 (1993).

[72] FDCA, 21 U.S.C § 362 (1992).

[73] *Prohibited & Restricted Ingredients in Cosmetics*, U.S. Food & Drug Administration (Feb. 25, 2022) (available at https://www.fda.gov/cosmetics/cosmetics-laws-regulations/prohibited-restricted-ingredients-cosmetics) (last accessed Dec. 22, 2022).

[74] Federal Register, Vol. 87, No. 98 (May 20, 2022) (available at https://www.govinfo.gov/content/pkg/FR-2022-05-20/pdf/2022-10531.pdf) (last accessed Dec. 22, 2022).

tests to demonstrate the safety of individual products or ingredients, and the law does not require cosmetics companies to share their safety data with the FDA or the public.

109.    The FDA has consistently advised manufacturers to use whatever testing is necessary to ensure the safety of products and ingredients, which may be substantiated through (1) reliance on already available toxicological test data on individual ingredients and on product formulations that are similar in composition to the particular cosmetic and (2) performance of any additional toxicological and other tests that are appropriate in light of such existing data and information.[75]

110.    Except for color additives and ingredients prohibited or restricted by regulation, a manufacturer may use any ingredient in the formulation of a cosmetic, provided that (1) the ingredient and the finished cosmetic are safe under the labeled or customary conditions of use, (2) the product is properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the laws the FDA enforces.[76]

111.    Under federal law, "[t]he label of a cosmetic product ***shall*** bear a warning statement whenever necessary or appropriate to prevent a health hazard that ***may*** be associated with the product." 21 C.F.R. § 740.1 (emphasis added). This warning directive directly correlates with the broad authority of manufacturers over their own cosmetic products to ensure that products are safe under labeled or customary

---

[75] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, U.S. Food and Drug Administration (Mar., 3, 2005) (available at https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated) (last accessed Dec. 22, 2022).
[76] *Id.*

conditions of use, properly labeled, and not adulterated or misbranded under FDA regulations.

112.   In short, under the current regulatory framework in the United States, it is incumbent upon the manufacturers of cosmetic products—and them alone—to investigate and assess the safety and efficacy of their products, and to warn consumers of any health hazard that may be associated with such products. Here, a wealth of scientific information is available regarding long-term use of hair relaxers as containing certain endocrine-disrupting chemicals, which should have alerted manufacturers of these products to the specific and dangerous harms associated with their products when used as intended, particularly in women of color.

113.   Defendants could remove the dangerous EDCs from the Products while complying with all FDA regulations applicable to cosmetics.

114.   Despite Defendants' awareness of the dangers of EDCs, they continue to use these chemicals in the Products without advising the public of their inclusion or dangerous propensities.

### F.   Plaintiff's use of hair relaxers and cancer diagnosis

115.   Plaintiff was first exposed to EDCs and/or phthalate-based products manufactured by Defendants in 1989. She was 13 years old when she began using Defendants' Products.

116.   Plaintiff used the Products by applying them to her scalp or by having a professional at a hair salon apply the Products. Such applications were performed exactly as instructed on the Product labels.

117.  Plaintiff would keep the Products on her hair for the time indicated in the instructions.

118.  Plaintiff would apply or have the Products applied at retouch intervals of approximately 4–8 weeks throughout her three decades of usage.

119.  There was never any indication, on the Product packaging or otherwise, that Plaintiff's normal use of the Products could and would cause her to develop endometrial cancer.

120.  Because Defendants' Products failed to contain adequate warnings or instructions regarding the increased risk of cancer with normal use, Plaintiff had no reason to suspect that her normal use of the Products would cause her injury. She reasonably relied on Defendants to advise her as to any defect in the Products as well as the actual ingredients/chemicals present in the Products.

121.  Plaintiff continued using the Products until 2020.

122.  Plaintiff was diagnosed with endometrial cancer in 2019 at age 43.

123.  Plaintiff underwent a total hysterectomy, bilateral salpingectomy, radiation treatments, and continued follow-up appointments.

124.  Plaintiff has no family history of endometrial cancer.

125.  As a result of Defendants' acts and/or omissions, Plaintiff has suffered extreme physical pain, severe emotional distress, and incurred economic damages.

**Equitable tolling**

126.  Plaintiff had no reason to suspect before late 2022 that her cancer diagnosis was caused by EDCs in Defendants' Products.

127.    Defendants willfully, wantonly, and intentionally conspired, and acted in concert, to withhold information from Plaintiff and the general public concerning the known hazards associated with the use of the Products.

128.    Defendants willfully, wantonly, and intentionally conspired, and acted in concert, to withhold safety-related warnings from Plaintiff and the general public concerning the known hazards associated with the use of the Products.

129.    Defendants willfully, wantonly, and intentionally conspired, and acted in concert, to withhold instructions from Plaintiff and the general public concerning how to identify, mitigate, and/or treat known hazards associated with the use of the Products.

130.    Defendants willfully, wantonly, and intentionally conspired, and acted in concert, to ignore relevant safety concerns and to deliberately *not* study the safety of the Products.

131.    Defendants failed to disclose known risks and, instead, affirmatively misrepresented that the Products were safe for their intended use. Defendants disseminated labeling, marketing, promotion, and/or sales information to Plaintiff and the general public regarding the safety of the Products knowing such information was false, misleading, and/or inadequate to warn of the safety risks associated with use of the Products. Defendants did so willfully, wantonly, and with the intent to prevent the dissemination of information known to them concerning the Products' safety.

132.    Further, Defendants actively concealed the true risks associated with the use of the Products, particularly as they relate to the risk of cancers caused by EDCs in the Products.

133.    Due to the absence of any warning by Defendants as to the significant permanent health and safety risks posed by the Products, Plaintiff was unaware that the Products could cause endometrial cancer, as this danger was not known to Plaintiff or the general public.

134.    Given Defendants' conduct and deliberate actions designed to deceive Plaintiff and the general public with respect to the safety of the Products, Defendants are estopped from relying on any statute-of-limitations defenses.

## CLAIM 1: STRICT LIABILITY—FAILURE TO WARN

135.    Plaintiff incorporates all prior allegations.

136.    Defendants were engaged in a business to design, formulate, produce, create, make, construct, assemble, test, market, label, distribute, blend, or sell the Products, or otherwise participate in the placing of the Products into the stream of commerce.

137.    Defendants produced, manufactured, or supplied the Products for introduction into trade or commerce and were intended for sale for commercial or personal use.

138.    The Products reached Plaintiff without a change in condition in which they were manufactured and sold by Defendants or otherwise released into the stream of commerce.

139.    Plaintiff used the Products on her hair, placing the Products in contact with her scalp, which is the intended use and thus a reasonably foreseeable use.

140. Defendants knew or in the exercise of reasonable care should have known about the foreseeable risks associated with the Products, including but not limited to the undisclosed inclusion of phthalates and other EDCs, such as the significantly increased risk of uterine or endometrial cancer.

141. Defendants were or should have been aware that phthalates and other EDCs in Defendants' Products significantly increase the risk of uterine or endometrial cancer, based on scientific knowledge dating back decades.

142. Had Defendants exercised the attention, perception, memory, knowledge, and intelligence that a reasonable manufacturer should possess and/or the superior attention, perception, memory, knowledge, or intelligence that Defendants possessed, Defendants would have warned of the foreseeable risks of using the Products, including the risk of cancer.

143. Defendants failed to provide a warning or instruction that a manufacturer exercising reasonable care would have provided concerning the risk of EDCs.

144. Defendants failed to take the precautions that a reasonable person would take in presenting the Products to the public.

145. Defendants failed to properly and adequately warn and instruct Plaintiff as to the risks and benefits of the Products given her need for this information. Had Defendants warned Plaintiff that use of the Products would significantly increase her risk of developing uterine or endometrial cancer, she would not have used them.

146. The Products were in an unreasonably dangerous and defective condition at the time of sale and use, in part due to their lack of warnings. To this day, Defendants'

hair-relaxers products, including the Products, do not contain adequate warnings and/or instructions regarding the increased risk of uterine or endometrial cancer. Defendants continue to market, advertise, and expressly represent to the general public that it is safe to use the Products.

147.   As a direct and proximate result of Defendants' unlawful acts and omissions in designing, manufacturing, marketing, selling, testing, and distributing the Products in an unreasonably dangerous and defective condition, Plaintiff developed endometrial cancer and has suffered economic and non-economic damages including physical pain, emotional distress, infertility, loss of enjoyment of life, and medical expenses.

148.   Defendants' actions or omissions demonstrate malice or aggravated or egregious fraud, warranting imposition of punitive damages to punish past misconduct and deter future misconduct.

## CLAIM 2: STRICT LIABILITY—DESIGN DEFECT

149.   Plaintiff incorporates all prior allegations.

150.   Defendants were engaged in a business to design, formulate, produce, create, make, construct, assemble, test, market, label, distribute, blend, or sell the Products, or otherwise participated in the placing of the Products into the stream of commerce.

151.   Defendants produced, manufactured, or supplied the Products for introduction into trade or commerce and were intended for sale for commercial or personal use.

152.   The Products reached Plaintiff without a change in condition in which they were manufactured and sold by Defendants or otherwise released into the stream of commerce.

153.    Plaintiff used the Products on her hair, which is the intended and thus a reasonably foreseeable use.

154.    Defendants knew or in the exercise of reasonable care should have known about the foreseeable risks associated with the Products, including but not limited to the undisclosed inclusion of phthalates and other EDCs, such as the significantly increased risk of uterine or endometrial cancer.

155.    Defendants were or should have been aware that phthalates and other EDCs in Defendants' Products significantly increase the risk of uterine or endometrial cancer, based on scientific knowledge dating back decades.

156.    Had Defendants exercised the attention, perception, memory, knowledge, and intelligence that a reasonable manufacturer should possess and/or the superior attention, perception, memory, knowledge, or intelligence that Defendants possessed, Defendants would have designed a product that did not carry the foreseeable risks of using the Products, including the risk of cancer.

157.    Defendants failed to design the Products as a manufacturer exercising reasonable care would have designed them, including but not limited to designing the Products without including EDCs that cause cancer.

158.    Defendants failed to take the precautions that a reasonable person would take in designing the Products.

159.    There was a defect in the Products manufactured and sold by Defendants, specifically the presence of EDCs in the Products.

160.    EDCs were present in the Products when the Products left Defendants' control.

161.   The presence of EDCs in the Products was the direct and proximate cause of Plaintiff's cancer.

162.   Plaintiff used the Products in the intended and reasonably foreseeable manner.

163.   The presence of EDCs made the Products more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

164.   The risks inherent in the inclusion of EDCs in the Products outweigh the benefits of EDCs in those Products.

165.   The propensity of phthalates and other EDCs to trigger cancerous growths in premenopausal women, including, but not limited to uterine or endometrial cancer, renders the Products unreasonably dangerous when used in the manner intended and to an extent beyond that would be contemplated by the ordinary consumer.

166.   The Products are inessential cosmetic products that do not treat or cure any serious disease. Safer alternatives, including fragrance-free products, have been readily available for decades.

167.   Defendants have known, or should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products so as to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

168.   As a direct and proximate result of Defendants' unlawful acts and omissions in designing, manufacturing, marketing, selling, testing, and distributing the Products in an unreasonably dangerous and defective condition, Plaintiff developed

endometrial cancer and has suffered economic and non-economic damages including physical pain, emotional distress, infertility, loss of enjoyment of life, and medical expenses.

169. Defendants' actions or omissions demonstrate malice or aggravated or egregious fraud, warranting imposition of punitive damages to punish past misconduct and deter future misconduct.

### CLAIM 3: NEGLIGENT FAILURE TO WARN
### (PRECEDING 2005 AND/OR 2007 AMENDMENTS
### TO OHIO REV. CODE § 2307.71 ET SEQ.)[77]

170. Plaintiff incorporates all prior allegations.

171. Defendants had a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

172. Defendants had a duty to warn all reasonably foreseeable consumers about the dangers of the Products, specifically the presence of EDCs in the Products.

173. Defendants breached their duty of care by failing to provide adequate warnings with their Products regarding the increased risk of cancer from normal use.

174. Instead of complying with their duty of care, Defendants designed, developed, manufactured, marketed, sold, and distributed the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

---

[77] Plaintiff's use of the Products predates the 2005 and 2007 amendments to Ohio's Products Liability Act. Ohio's Constitution, Art. II § 28, denies the general assembly the power to pass retroactive laws. This extends to a prohibition on abrogating Plaintiff's common-law remedies for conduct in which Defendants engaged prior to the enactment of statute's current version. Plaintiff expressly reserves the right to seek relief and remedies based on her common-law rights.

175.   Defendants' misleading advertising (in the absence of any warning) created a danger of the injuries Plaintiff suffered, which were reasonably foreseeable at the time of design, manufacture, distribution, and sale of the Products.

176.   A reasonable manufacturer under the same or similar circumstances would have warned and instructed about the dangers of the Products.

177.   To date, Defendants have not warned the public of the dangers of the Products, specifically the presence of EDCs and the dangers those toxic chemicals in their Products pose.

178.   Defendants knew, or in the exercise of reasonable care should have known, that the reasonably foreseeable use of their Products was dangerous, harmful, and injurious.

179.   Defendants knew, or in the exercise of reasonable care should have known, that ordinary consumers such as Plaintiff would not realize the potential risks and dangers of the Products, including the increased risk of uterine or endometrial cancer, when used as intended.

180.   Had Defendants provided an adequate warning of the risk of cancer based on normal use of the Products, Plaintiff would not have used the Products and would not have developed cancer.

181.   Defendants' lack of adequate and sufficient warnings and instruction, and their misleading advertising, caused or was a substantial contributing factor in causing harm to Plaintiff.

182.   As a direct and proximate result of Defendants' unlawful acts and omissions in designing, manufacturing, marketing, selling, testing, and distributing the Products in breach of their duties of care, Plaintiff developed endometrial cancer and has suffered economic and non-economic damages including physical pain, emotional distress, infertility, loss of enjoyment of life, and medical expenses.

183.   Defendants' actions or omissions demonstrate malice or aggravated or egregious fraud, warranting imposition of punitive damages to punish past misconduct and deter future misconduct.

### CLAIM 4: NEGLIGENT DESIGN DEFECT
### (PRECEDING 2005 AND/OR 2007 AMENDMENTS
### TO OHIO REV. CODE § 2307.71 ET SEQ.)[78]

184.   Plaintiff incorporates all prior allegations.

185.   Defendants had a duty to all reasonably foreseeable users to design safe products, including the Products.

186.   Defendants breached that duty by including toxic chemicals in the Products and otherwise selling the Products in an unreasonably dangerous condition.

187.   Because of their defective design, the Products failed to perform safely when used by Plaintiff in the intended and reasonably foreseeable manner, specifically increasing her risk of developing cancer.

---

[78] Plaintiff's use of the Products predates the 2005 and 2007 amendments to Ohio's Products Liability Act. Ohio's Constitution, Art. II § 28, denies the general assembly the power to pass retroactive laws. This extends to a prohibition on abrogating Plaintiff's common-law remedies for conduct in which Defendants engaged prior to the enactment of statute's current version. Plaintiff expressly reserves the right to seek relief and remedies based on her common-law rights.

188. The propensity of phthalates and other EDCs to trigger cancerous growths in premenopausal women, including, but not limited to uterine or endometrial cancer, renders the Products unreasonably dangerous when used in the manner intended and to an extent beyond that would be contemplated by the ordinary consumer.

189. The Products are inessential cosmetic products that do not treat or cure any serious disease. Safer alternatives, including fragrance-free products, have been readily available for decades.

190. Defendants have known, or should have known, that the Products are unreasonably dangerous but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products so as to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

191. Defendants breached their duty of care by failing to use cost-effective, reasonably feasible alternative designs for the Products that did not carry the risk of developing cancer.

192. A reasonable manufacturer under the same or similar circumstances would have designed a safer product.

193. As a direct and proximate result of Defendants' unlawful acts and omissions in designing, manufacturing, marketing, selling, testing, and distributing the Products in breach of its duties of care, Plaintiff developed endometrial cancer and has suffered economic and non-economic damages including physical pain, emotional distress, infertility, loss of enjoyment of life, and medical expenses.

194.   Defendants' actions or omissions demonstrate malice or aggravated or egregious fraud, warranting imposition of punitive damages to punish past misconduct and deter future misconduct.

**CLAIM 5: NEGLIGENCE**
**(PRECEDING 2005 AND/OR 2007 AMENDMENTS**
**TO OHIO REV. CODE § 2307.71 ET SEQ.)[79]**

195.   Plaintiff incorporates all prior allegations.

196.   Defendants owed a duty of reasonable care in the design, manufacture, marketing, distribution, testing, and sale of the Products.

197.   Through gross and extreme negligence and/or recklessness, Defendants breached that duty by:

    a.  failing to warn of the hazards associated with the use of the Products;

    b.  failing to properly test the Products;

    c.  failing to ensure that the Products did not carry an increased risk of cancer in normal users;

    d.  failing to inform consumers as to the safe and proper methods of using the Products;

    e.  failing to inform consumers as to methods for reducing the risk of cancer caused by the Products;

---

[79] Plaintiff's use of the Products predates the 2005 and 2007 amendments to Ohio's Products Liability Act. Ohio's Constitution, Art. II § 28, denies the general assembly the power to pass retroactive laws. This extends to a prohibition on abrogating Plaintiff's common-law remedies for conduct in which Defendants engaged prior to the enactment of statute's current version. Plaintiff expressly reserves the right to seek relief and remedies based on her common-law rights.

f.  failing to advise the public in general and Plaintiff specifically of the known dangers of using the Products;

g.  marketing, advertising, and labeling the Products as safe for all uses despite knowledge to the contrary;

h.  failing to remove the Products from the market when Defendants knew or should have known the Products were defective; and

i.  otherwise failing to act as a reasonably prudent manufacturer would act under similar circumstances.

198.  At all relevant times, Defendants knew or should have known that the Products were unreasonably dangerous and defective when used in a reasonably foreseeable manner.

199.  Defendants' acts and omissions constitute gross negligence because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to consumers including Plaintiff.

200.  Defendants acted and/or failed to act in a willful manner, with conscious and reckless disregard for the rights and interests of Plaintiff, and Defendants' acts and omissions had a great probability of causing significant harm and did result in such harm to Plaintiff.

201.  Plaintiff was injured as a direct and proximate result of the negligence and/or gross negligence alleged.

202.   Defendants' negligence and/or gross negligence caused or was a substantial factor in causing and/or contributing to Plaintiff's injuries.

203.   As a direct and proximate result of Defendants' unlawful acts and omissions in designing, manufacturing, marketing, selling, testing, and distributing the Products in breach of its duties of care, Plaintiff developed endometrial cancer and has suffered economic and non-economic damages including physical pain, emotional distress, infertility, loss of enjoyment of life, and medical expenses.

204.   Defendants' actions or omissions demonstrate malice or aggravated or egregious fraud, warranting imposition of punitive damages to punish past misconduct and deter future misconduct.

## CLAIM 6: VIOLATION OF OHIO REV. CODE § 1345.02

205.   Plaintiff incorporates all prior allegations.

206.   Defendants have a statutory duty to refrain from unfair and deceptive acts and practices in designing, labeling, developing, manufacturing, promoting, marketing, selling, and distributing the Products.

207.   As detailed above, Defendants engaged in unfair and deceptive acts and practices regarding the Products, including but not limited to claiming that the Product have benefits and quality that they do not have while failing to disclose the dangers of the Products. Defendants advertised the Products as safe, effective, and gentle despite the fact that the Products contained toxic chemicals that cause cancer.

208.   Defendants unfair and deceptive acts and practices were likely to mislead a reasonable consumer and violated Ohio Rev. Code § 1345.02.

209. Plaintiff purchased the Products for personal use and suffered ascertainable losses as a result of Defendants' cumulative and indivisible violations of Ohio's consumer-protection law. The cumulative effect of Defendants' acts and practices directed at Plaintiff and other consumers was to create demand for and sell the Products. Each aspect of Defendants' conduct combined to artificially create sales of the Products.

210. Had Defendants not engaged in the deceptive conduct described above, Plaintiff would not have purchased the Products and incurred damages.

211. Defendants' wrongful conduct resulted in pecuniary gain as Plaintiff would not have paid for the Products had she known they would cause her to develop cancer.

212. Defendants' intentional, deceptive, unconscionable, and fraudulent representations and material omissions to Plaintiff and consumers generally constituted unfair and deceptive trade practices in violation of Ohio Rev. Code § 1345.02.

213. Plaintiff reasonably relied on Defendants' marketing and promotional representations in determining whether to use the Products and which Products to use.

214. Defendants have taken no action to cure or remedy the defective and dangerous condition of the Products or the false and misleading marketing and promotional efforts used to sell the Products to Black women like Plaintiff.

215.    As a direct and proximate result of Defendants' unlawful acts and omissions, Plaintiff has suffered economic and non-economic damages in an amount to be determined at trial.

216.    Defendants' actions or omissions demonstrate malice or aggravated or egregious fraud, warranting imposition of punitive damages to punish past misconduct and deter future misconduct.

CLAIM 7: FRAUDULENT CONCEALMENT

217.    Plaintiff incorporates all prior allegations.

218.    Defendants were aware that the Products contained toxic chemicals that increased the risk of cancer in normal users of the Products.

219.    The fact that the Products contained toxic chemical that increased the risk of cancer was a material fact to Plaintiff.

220.    Defendants were aware that they did not disclose to consumers including Plaintiff that the Products contained toxic chemicals that increased the risk of cancer.

221.    Defendants withheld and/or failed to disclose to consumers including Plaintiff the fact that the Products contained toxic chemical that increased the risk of cancer with the intention of misleading consumers including Plaintiff into relying on the safety of the Products for normal use.

222.    Plaintiff, as a consumer, had a right to rely on Defendants to disclose the presence of toxic, cancer-causing chemicals in the Products and reasonably relied to her detriment of Defendants' failure to disclose this material fact.

223. As a direct and proximate result of Defendants' unlawful acts and omissions, Plaintiff has suffered economic and non-economic damages in an amount to be determined at trial.

224. Defendants' actions or omissions demonstrate malice or aggravated or egregious fraud, warranting imposition of punitive damages to punish past misconduct and deter future misconduct.

**PRAYER FOR RELIEF**

Plaintiff respectfully demands:

- Entry of judgment in Plaintiff's favor on all claims for relief;
- Economic and non-economic damages to compensate for the past and future losses suffered including but not limited to physical pain, emotional distress, loss of enjoyment of life, medical expenses, and lost earnings;
- Reimbursement of the purchase price of the Products;
- Attorneys' fees and costs of suit;
- Punitive damages;
- Pre- and post-judgment interest at the highest rates permitted by law; and
- Such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff respectfully demands a trial by jury.

Respectfully submitted,

*/s/ Ashlie Case Sletvold*
Ashlie Case Sletvold
Jessica S. Savoie
Marilyn K. Eble
**PEIFFER WOLF CARR KANE**
   **CONWAY & WISE, LLP**
6370 SOM Center Road, Suite 108
Cleveland, Ohio 44139
(216) 589-9280
asletvold@peifferwolf.com
jsavoie@peifferwolf.com
meble@peifferwolf.com

*Attorneys for Plaintiff*